OPINION OF THE COURT
Joseph J. Sedita, J.
The need for efficient and effective governmental instrumentalities to deal with our increasingly complex and technologically sophisticated society has led to the creation, by our State Legislature, of a number of unique entities known as “public authorities”. These “authorities” are public corporations which were created as specialized hybrids which could utilize the flexibility and independence of the corporate structure in achieving their primary goals as instrumentalities for accomplishing a variety of public purposes. (See 47 NY Jur, Public Authorities, § 1; Staff Report on Public Authorities, Temporary State *79 Comm on Co-ordination of State Activities, NY Legis Doc, 1956, No. 46.) In creating public authorities, the Legislature faced a classic dilemma. How much power would it be necessary to transfer to these new “creatures” of the State to insure their effectiveness, and how much and how long a “leash” would it be necessary for the State to maintain on said authorities in order to insure public accountability?
A part of this case focuses on one such “leash” written into the Public Authorities Law to insure greater public accountability by one such creature of the State known as the Power Authority of the State of New York (hereinafter known as PASNY). This particular “leash” is section 1009 of the Public Authorities Law and provides that certain types of contracts entered into by PASNY must be subject to public hearings and gubernatorial approval prior to their effectuation. This court is asked, as part of this case, to determine whether or not a particular agreement entered into between defendant PASNY and New York Electric and Gas Corporation (hereinafter NYSEG) falls within the scope and mandate of section 1009 of the Public Authorities Law. Plaintiffs additionally challenge the agreement for alleged violations of other statutory requirements.
A premature leap into the heart of this controversy would be inappropriate before first understanding the background of this dispute and navigating the substantial procedural shoals which threaten to sink any judicial expedition into the merits of this case.
Plaintiffs wish to enjoin effectuation of a letter agreement which was executed by the defendants (PASNY and NYSEG) on February 3, 1982. Defendants seek dismissal of this matter on a variety of grounds. Plaintiffs are electric co-operatives organized to supply electric energy to certain rural areas of the State. Defendant, PASNY, is a public authority created pursuant to the Public Authorities Law for the production and development of hydroelectric power for the benefit of the people of the State. (See Public Authorities Law, § 1001.) Defendant, NYSEG, is a public utility corporation in the business of generating, transmitting, distributing and selling electric power.
*80 The relationship between plaintiffs and PASNY has been substantial. PASNY entered into contracts with plaintiffs to provide for the transmission, distribution and sale of electric power to said rural co-operatives. The rural co-operatives agreed to pay PASNY transmission and substation charges and to reimburse PASNY for all increases in the cost of transmission service provided by NYSEG. The Power Authority entered into contracts with NYSEG to provide for the use of NYSEG’s transmission facilities for the delivery of power to the plaintiffs. '
In 1982, PASNY entered into a new agreement with NYSEG which substantially increased rates and made other substantial changes in the nature of the transmission arrangement. Plaintiffs view this as a wholly new agreement, whereas defendants see it as only a “modification” of prior contracts. The new agreement was submitted to the Federal Energy Regulatory Commission (hereinafter FERC) for approval of the new rates. By an order dated June 4, 1982 the FERC accepted the new transmission rates agreement for filing.
The procedural issues which confront this court include; which Statute of Limitations applies; do plaintiffs have proper standing to go forward with their suit; have necessary parties been omitted; is jurisdiction lacking due to exclusive Federal jurisdiction; do principles of res judicata or collateral estoppel require dismissal; have plaintiffs failed to state a cause of action; and finally is any partial summary resolution of this case, or a portion thereof, precluded by the existence of fact issues which would require a hearing or trial.
The Statute of Limitations issue, we feel, must be resolved in favor of plaintiffs. Plaintiffs claim that this matter is more appropriately cast as an action for a declaratory judgment which has a six-year Statute of Limitations. Defendants argue that it should be considered a CPLR article 78 proceeding having a four-month Statute of Limitations. They view the action of PASNY in entering into this agreement as essentially administrative in nature. Even assuming the shorter four-month article 78 period applies, the four months would not run until the decision of PASNY was approved by the FERC. Until *81 acceptance by the FERC, the decision of PASNY to approve the new agreement would not and did not have any binding effect on the plaintiffs or anyone else. (Federal Power Act, § 205, subds [c], [d]; US Code, tit 16, § 824d, subds [c], [d].) It is well-established law that the four-month limitation period, pursuant to CPLR 217, does not start to run until the decision or action has or could have impact on the petitioner. (8 Weinstein-Korn-Miller, NY Civ Prac, par 7804.02; 24 Carmody-Wait 2d, NY Prac, § 145:239.) Where a decision was to take effect on a latter date, the limitations statute would not commence running until that effective date. (See Matter of Gargiul v Board of Educ., 54 AD2d 1085; Matter of Gates v Walkley, 41 AD2d 319; Matter of Wininger v Williamson, 46 AD2d 689.)
By its own terms, the new agreement was not to take effect until July 1, 1982, and could not take effect under Federal law until after acceptance by the FERC. The FERC accepted the letter agreement for filing on June 4, 1982 but postponed the effective date of the agreement to July 2, 1982. On or about July 21, 1982, the plaintiffs commenced this action. Said date is well within four months of the effective date of this agreement.
We note in passing that Matter of Allstate Ins. Co. v Stewart (36 AD2d 811, affd 29 NY2d 925, mot for rearg den 30 NY2d 694) is not in point because in that case the contingency (preparation of certain forms) was only “incidental” to the decision of the Superintendent of Insurance. In our case, approval by the FERC was essential to the effectuation of the decision to approve the new agreement. We also note that the Court of Appeals appears, as a matter of policy, to favor the shorter Statute of Limitations in determining if a body’s action is “administrative” or “legislative” in nature. (See Press v County of Monroe, 50 NY2d 695; Solnick v Whalen, 49 NY2d 224.) We have not deemed it necessary to delve into this thorny issue since we are of the opinion that the action is not time barred even if the shorter statute is applied.
A second procedural issue raised is whether the plaintiffs have standing to sue in this matter. We feel that they clearly are third-party beneficiaries of these contracts and as such have a clear interest in them, and right to *82 commence suit to protect their interests. The original contracts specifically refer to rural electric co-operatives implying a directly beneficial relationship. (See 22 NY Jur 2d, Contracts, §§ 271-281.) We additionally note that not only are rural electric co-operatives implicitly parties to be benefited in the original contracts, but they are expressly named as parties to be benefited in the statute. (See Public Authorities Law, § 1001.)
A third procedural issue is whether or not plaintiffs have failed to join necessary parties. Defendants have argued that the FERC and/or municipal customers should be necessary parties. The FERC specifically excluded determination of State issues when it issued its initial ruling on June 4, 1982. Said ruling specifically stated that: “Insofar as NYSRECA raises issues of state law, however, its appropriate avenue of relief is a court of competent jurisdiction.”
The FERC has specifically excluded itself from determination of State issues and as such is not a necessary party. Municipal electric utility customers may well be affected by the ruling of this case, but, they cannot be said to be “necessary” or essential for the determination of the issues herein. Said customers may be permissible intervenors pursuant to CPLR1013, but apparently have not moved for intervention. The Court of Appeals has been extremely reluctant to dismiss a matter on grounds of the indispensability of a potential party who was not joined. (See Matter of Castaways Motel v Schuyler, 24 NY2d 120.)
This court has found no substantial basis for dismissing this case based upon nonjoinder of a necessary party.
A primary issue has been raised concerning the subject matter jurisdiction of this court. Defendants assert that the FERC has jurisdiction over the reasonableness of rates and any issues incident thereto. (See Arkansas La. Gas Co. v Hall, 453 US 571; City of Cleveland v Federal Power Comm., 525 F2d 845.)
There is little or no dispute as to the exclusive jurisdiction of the FERC over determination of the reasonableness of rates. (Arkansas La. Gas Co. v Hall, supra.) The nub of this issue is jurisdiction over attendant State contract or statutory compliance issues which either were raised or could have been raised before the FERC.
*83 In an amicus curiae brief submitted last year in the case of Town of Massena v Niagara Mohawk Power Corp. (County of St. Lawrence, 1982), the FERC outlined its own views as to its jurisdiction in this area. In essence, it views itself as having exclusive jurisdiction over the reasonableness of rates and concurrent jurisdiction with State courts on State issues relevant or incident to the filing and establishment of a rate. It views certain matters (in that case it was the issue of damages) to be within the exclusive jurisdiction of the State courts.
We are persuaded to take the position taken by the FERC. Had it chosen to take jurisdiction over State issues raised, it could have resolved these issues thereby precluding a redetermination of those issues by the State. However, as we noted above, the FERC, by the express terms of its order, declined to determine the State issues. Since the FERC declined to determine those issues, and the State courts have concurrent jurisdiction, this court is free to deal with these issues.
Closely tied to the above jurisdictional issues are the defendants’ claims that principles of res judicata and collateral estoppel preclude consideration of these claims by this court. We disagree essentially for the same reason we believe that this court has subject matter jurisdiction. These issues were not resolved before FERC although they either were or could have been raised. The FERC expressly declined to rule on State issues and referred the matter to a “Court of competent jurisdiction”. Since these State issues have not been resolved, this court cannot be precluded from considering them by principles of res judicata or collateral estoppel.
The resolution of the remaining issues before the court (failure to state a cause of action and motions for partial summary judgment) will require us to examine the issues which form the very heart of this controversy.
Defendants look to subdivisions 7 and 8 of section 1005 of the Public Authorities Law as their statutory basis or authority for PASNY to enter into this new agreement. In the alternative they argue that even if subdivision 5 of section 1005 applied, the new agreement is only a “modification” of previously properly authorized agreements *84 which specifically provided for periodic modification. They argue, in effect, that under either statutory subdivision they should win and that the plaintiffs have no basis for their complaints.
Plaintiffs argue that subdivision 5 of section 1005 clearly controls the situation and that all its requirements must be effectuated. Since section 1009 of the Public Authorities Law requires public hearings and gubernatorial approval of all contracts under subdivision 5 of section 1005, they argue that these additional requirements must be met. In response to the argument that this new agreement is only an authorized “modification” of the old agreements, even if subdivision 5 is applicable, the plaintiffs point to the substantial nature of the changes in the rates as well as the nature of the transmission, and point out that this is no mere modification but, in effect, a substantially new contract which must stand on its own feet in satisfying statutory requirements. Plaintiffs wax poetic in summarizing this argument recalling the oft-stated truism that “a rose by any other name is still a rose.”
In looking at these crucial issues, the court must initially determine if these are purely legal questions or if there are facts in dispute which may have a relevancy to these issues. Technically, issue has not been joined since a formal answer has not been submitted by the defendants. However, while formal “answers” have not been filed, it cannot be said that the plaintiffs’ claims have not been answered. The papers submitted on these motions include extensive affidavits on behalf of the defendants together with extensive reference materials and legal argumentation. (See Siegel, New York Practice, § 279; Siegel, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C3212:ll, C3212:12.)
In reviewing the voluminous papers before the court, we have a natural hesitancy to determine that the issues presented to the court are, in essence, “legal” questions rather than factual questions. The parties are not in dispute as to what is included in the agreement in question or as to when it was approved. They are not disputing its items. Those terms are quite clear. As we noted earlier, the nature of this dispute focuses on which statute or statutes *85 should govern this agreement and how it should be categorized (“modification” or “new” agreement). There is no doubt in anyone’s mind that the defendants intended to enter into the agreement in question. The applicability of certain statutes and how to characterize this agreement are purely legal questions and should be dealt with as such by the court.
Sections 1005 and 1009 of the Public Authorities Law were part of a comprehensive consolidation of laws dealing with public utility authorities (L 1939, ch 870). Subdivision 7 of section 1005 was amended in 1949 (L 1949, ch 612) and subdivision 8 of section 1005 was amended in 1968 (L 1968, ch 294; par c, amd L 1974, ch 369, § 8). Public utilities occupy a highly sensitive position in our State and society. They provide essential services, and any deficiency can cause serious harm to individual citizens and businesses throughout the State. Being in a monopoly position also places public authorities and utilities in a uniquely powerful position in establishing prices for their essential products and services. Our Legislature was, of course, not unaware of this situation and created various mechanisms to insure public input and accountability in this highly sensitive area. One such mechanism was section 1009 which required that certain agreements effectuated, pursuant to subdivision 5 of section 1005, be subject to public hearing and gubernatorial approval.
Contracts covered by subdivision 5 include contracts for the “sale, transmission and distribution of power generated by such projects [Niagara and St. Lawrence hydroelectric projects]”. The concept that this statute only covers contracts which provide for all three aspects (sale, transmission, and distribution) would be a highly restrictive interpretation of this statute allowing for easy avoidance of its requirements by the drawing of separate contracts for each area (sale, transmission, or distribution). Statutes promoting the public good are generally to be liberally construed. (McKinney’s Cons Laws of NY, Book 1, Statutes, §§ 341, 365.) We decline to hold that all three elements must be present in a contract in order for subdivision 5 to be applicable. The conclusion one may logically draw from this holding is that appropriate contracts con *86 taining one or two of the three elements (sale, transmission, or distribution) could come within the ambit of this subdivision and its requirements.
The next step in our analysis is to consider defendants’ contention that this “agreement” has as its statutory basis subdivisions 7 and/or 8 of section 1005. These subdivisions do not contain the more stringent requirements of subdivision 5, and section 1009 (hearings and gubernatorial approval) is not specifically applicable to these subdivisions. Subdivision 7’s authorization is primarily oriented to and in relation to building projects of the authority. Subdivision 8, however, is more specifically in point and authorizes the authority “to enter into contractual arrangements with utility companies * * * c. [w]ith respect to construction, acquisition, ownership, operation and/or use of transmission facilities.” This subdivision clearly authorizes transmission contracts.
A crucial decision for the court in interpreting these statutes is to determine whether subdivision 7 or paragraph c of subdivision 8 may form an independent alternative statutory basis for transmission contracts (perhaps replacing by implication that portion of subdivision 5 covering transmission contracts), or whether they are cumulative with subdivision 5, forming a joint basis as authorization for transmission contracts. If the basis was held to be joint or cumulative, the requirements of both statutes would be enforceable by the courts. (See McKinney’s Cons Laws of NY, Book 1, Statutes, § 395; Tommasi v Archibald, 114 App Div 838; People v Dwyer, 160 App Div 542, affd 215 NY 46.)
An examination of these later subdivisions reveals no express or implied repeal of or intent to supplant the requirements of subdivision 5 of section 1005. The court has found nothing which would indicate that the Legislature intended in enacting these later subdivisions to supplant, in part, the requirements and mandates of subdivision 5. As noted earlier, the provisions of subdivision 5, read together with section 1009, encapsulate major procedural protections intended by the Legislature to insure public oversight and input in the development of certain types of power authority contracts which could have a *87 significant bearing on the cost and delivery of power to the citizens and businesses of our State. (Staff Report on Public Authorities, Temporary State Comm on Co-ordination of State Activities, NY Legis Doc, 1956, No. 46.) These are not minor technical requirements which would be lightly discarded or replaced by the Legislature without a clearly expressed intent to effectuate that purpose. The only proper conclusion that this court can draw is that these subdivisions form a joint statutory basis for “transmission” contracts. The substantive requirements of each of these subdivisions should be binding upon the authority in developing these types of contracts.
Having determined the applicability of subdivision 5, the court must now examine the defendants’ assertion that the new agreement is merely a “modification” of previous agreements which provided for periodic modification. Since this is only a “modification”, they argue that the requirements of subdivision 5 and section 1009 should not apply. In order to apply the requirements of subdivision 5 and section 1009 to the new agreement, would require a finding either that the new agreement was not, in fact, a “modification” of the original contracts or that even if it was a valid and permissible modification of the original contracts, said modification was so substantial as to trigger the procedural requirements of subdivision 5 and section 1009.
Webster’s Dictionary defines modification as a “partial or slight change in form * * * a slight reduction” (Webster’s New Twentieth Century Dictionary [unabridged 2d ed]).
Black’s Law Dictionary (rev 4th ed) defines modification as “[a] change; an alteration which introduces new elements into the details, or cancels some of them, but leaves the general purpose and effect of the subject-matter intact.”
In both of these definitions, the sense or essence of modification is a “slight” change in details leaving the substance primarily intact. The new agreement which is subject to our scrutiny increases rates by several hundred per cent and changes the essential nature of the type of service to be provided. By both quantitative and qualitative standards, this is a major substantive change in the *88 relationship between the contracting parties. This is clearly not some minor adjustment in rates or other minor detail of the original contracts. We note again, that the terms of the respective agreements are not in dispute and our conclusion is legal rather than factual in nature. In addition, we have concluded that even if the new contract is considered as a modification authorized by the original contracts, the substantial changes which the agreement or “modification” embodies would render it subject to the requirements of subdivision 5 and section 1009. We also note in passing that the original contracts themselves never fully satisfied the requirements of section 1009 in that public hearings were never held. The original contracts themselves, therefore, form a rather shaky basis for asserting compliance with section 1009.
As this court previously noted, the Power Authority is a unique creation and creature of the State imbued with the power and independence necessary for it to accomplish its highly specialized tasks. In its wisdom, the Legislature fully realized that although the creature was to be given great freedom and flexibility, the State would have to maintain sufficient statutory mechanisms for review and oversight to insure public accountability. PASNY is exempted from many of the ordinary mechanisms for oversight of State agencies (see Public Authorities Law, § 1014), and this fact makes even more significant the provisions which were built into the statute to insure public oversight and accountability. Section 1009 is a major and important mechanism designed to insure public accountability which was built into this statute by the Legislature. (See Staff Report on Public Authorities, NY Legis Doc, 1956, No. 46, p 535.)
Such an important provision for protecting the public ought to be vigorously enforced, and any possible ambiguity in its application ought to be resolved in favor of public accountability. (Note, again, McKinney’s Cons Laws of NY, Book 1, Statutes, § 341, which directs that public benefit statutes be “liberally” construed.) We believe that the Legislature clearly intended to insure principles of democratic accountability through public hearings and the *89 requirement of final approval by the elected representative of all the people of this State.
These provisions are of such importance that the court must consider their requirements to be mandatory rather than merely “directory” and as such, must be considered as conditions precedent to the validity of any contract. Since there has been no compliance, at least with the requirements of section 1009 for public hearings and gubernatorial approval, the new agreement must be considered to be without binding effect. (See McKinney’s Cons Laws of NY, Book 1, Statutes, § 171.)
Accordingly, defendants’ motions are denied and plaintiffs’ motion for a declaration that the letter agreement is void is granted. Plaintiffs’ request for a determination of a return to the previous rates is denied, without prejudice. As noted earlier, the FERC has exclusive jurisdiction over approval of rates.